NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO E.C. AND C.C.

No. 1 CA-JV 23-0227
FILED 06-27-2024

---

Appeal from the Superior Court in Maricopa County
No. JD42185
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Litzy C.*

Arizona Attorney General's Office, Tucson
By Jennifer L. Thorson, Toni M. Valadez
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Jennifer M. Perkins and Judge David D. Weinzweig joined.

---

**J A C O B S**, Judge:

¶1        Litzy Carvajal ("Mother") appeals the termination of her parental rights as to her children E.C. and C.C., arguing the juvenile court erred by finding termination was in their best interests.  Because the record supports that, by a preponderance of the evidence, termination was in E.C.'s and C.C.'s best interests, we affirm.

## FACTS AND PROCEDURAL HISTORY

### A.        After DCS Received a Report That Mother was Positive for Fentanyl and THC, DCS Removed E.C. and C.C. From Mother and Filed a Dependency Proceeding.

¶2        E.C. was born to Mother and a father not party to this appeal on August 1, 2017.  C.C. was born to Mother and an unknown father on June 24, 2022.  The Department of Child Safety ("DCS") received a report that after birth, C.C. showed signs of withdrawal and that Mother's urine contained fentanyl and THC.

¶3        While investigating, DCS interviewed Mother.  Mother admitted she had been using fentanyl for two years and was taking five to eight pills a day.  Mother explained she had sought treatment but relapsed.  Mother also admitted she stopped using fentanyl when she found out she was pregnant with C.C. at three months but resumed at around five months.  Mother told DCS she was then on a two to three year probation for auto theft.  Mother explained that her probation required her to engage in substance-abuse treatment, but that she had not sought it.  After the interview, Mother continued testing positive for fentanyl and THC.

¶4        Following the interview, DCS implemented a present-danger plan from June 24, 2022, to July 8, 2022, but Mother still failed to engage in services or visit C.C. in the hospital.  During this time, Mother was kicked out of her mother's house on multiple occasions, continued using fentanyl, and could not provide for the children's basic needs.  After the present danger plan ended, DCS placed E.C. with his paternal grandmother.  Once C.C. was discharged from the hospital on July 20, 2022, DCS placed her with a foster family.  DCS then moved to find E.C. and C.C. dependent as to Mother and the juvenile court found them dependent.

### B. Mother Failed to Engage in the Services DCS Provided, Leading DCS to Move to Terminate Her Parental Rights.

**¶5** DCS pursued a family reunification plan. Throughout it, DCS offered Mother many services, including random drug testing, substance abuse assessment and outpatient treatment, and supervised visitation. Mother was also required to comply with her probation terms during the plan.

**¶6** Despite DCS providing these services, Mother failed to engage in them from July 2022 to September 2023. Mother tested positive for fentanyl, THC, and benzodiazepine in August 2022 and did not begin testing again until September 2023. DCS provided Mother with resources for substance abuse, informing her that Terros had beds available. Mother said she was going to check into detox services but DCS did not receive confirmation that she engaged in this service.

**¶7** DCS also referred Mother to supervised visits with her paternal grandmother and a DCS case aide. DCS's case manager did not report concerns with the visits Mother attended; however, Mother did not engage in the services with the case aide despite the aide's many attempts to contact Mother. Mother later failed to attend supervised visits and became unwelcome in paternal grandmother's home, where E.C. lived. DCS provided Mother with the nurturing parenting program, in which Mother occasionally, but inconsistently, engaged. Mother was closed out of that service in October 2022.

**¶8** In October 2022, Mother was arrested when she violated her probation order and the police saw drug paraphernalia and "ongoing [f]entanyl use" in the home. After Mother's release from jail, she continued violating her probation terms. For that reason, DCS moved to terminate her rights for chronic substance abuse, six month out-of-home placement for C.C., and nine month out-of-home placement for C.C. and E.C.

### C. After Moving to Terminate Her Rights, Mother Requested More Time in the Reunification Plan to Receive Services.

**¶9** Shortly after DCS moved to terminate Mother's rights, Mother was released from jail in September 2023 and moved in with her mother. Mother then asked DCS to reinstate services.

**¶10** Mother requested random drug testing, which matched a term of her probation. Mother took three negative tests in September

2023, but then ceased testing. DCS re-referred Mother for supervised visits which Mother attended, but while at a visit in November 2023, Mother was overheard referring to her own prior attempt to buy drugs. At other supervised visits, Mother smelled like marijuana. Later in November, Mother was kicked out of her residence when her mother got a restraining order against her. Finally, DCS had re-referred Mother to Terros, where she was diagnosed with substance abuse, anxiety, and depression. Terros referred her to its Ladders program, where she completed an initial intake on December 5, 2023, the day before the severance trial.

### D. The Juvenile Court Terminated Mother's Rights as to E.C. and C.C., Finding Termination in Their Best Interests.

¶11 The court held a hearing on DCS's motion to terminate Mother's parental rights on December 6, 2023. Mother testified that her parental rights should not be terminated because she completed the Terros intake, was going to participate in the Ladders program, and had not been using illegal drugs since June 2023, and was thus clean for six months. Mother, who was diagnosed by Terros with a cannabis use disorder, admitted she was still using marijuana. Mother testified that while she was busy helping her aunt, she would prioritize drug testing and remaining sober. Mother testified that she had been visiting with E.C. and C.C. on a weekly basis since September 2023 and would continue visiting them. The court found Mother's testimony unreliable because Mother had only tested three times in September 2023, even though she was aware the severance hearing was approaching.

¶12 The court terminated Mother's rights for prolonged substance abuse under A.R.S. § 8-533(B)(3), six months out-of-home placement under A.R.S. § 8-533(B)(8)(b) for C.C., and nine months out-of-home placement under A.R.S. § 8-533(B)(8)(a) for E.C. and C.C. The court found that DCS proved by a preponderance of the evidence termination was in E.C.'s and C.C.'s best interests. The court found E.C. would benefit from terminating Mother's rights because E.C. was living with his paternal aunt who was considered an adoptive placement, and if his paternal aunt did not adopt him, he was adoptable. Mother did not contest these findings, or other, related findings relating to C.C.'s current adoptive placement.

¶13 Mother timely appealed. We have jurisdiction under A.R.S. §§ 8-235, 12-120.21(A)(1), and 12-2101(A)(1).

**DISCUSSION**

¶14     Mother appeals the juvenile court's decision to terminate her parental rights as to E.C. and C.C. under A.R.S. §§ 8-533(B)(3), 8-533(B)(8)(b), 8-533(B)(8)(a), arguing insufficient evidence demonstrated that termination was in their best interests. Because the juvenile court appropriately weighed the totality of the circumstances and evidence supported its conclusions, we affirm.

> **The Court's Order Terminating Mother's Parental Rights Is Supported By Reasonable Evidence.**

¶15     We review a best-interests finding for an abuse of discretion and reverse only if there is "no reasonable evidence to support [the findings]." *Mary Lou C. v. Arizona Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004) (citations omitted). The court must find termination in the child's best interests by a preponderance of the evidence. *Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 537 ¶ 13 (App. 2018). When considering the child's best interests, the court must consider the totality of the circumstances. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶¶ 12-13 (2018). It is in a child's best interests to terminate parental rights if the child would either be benefitted by terminating the relationship or harmed by its continuation. *Id.* at 150 ¶ 13. The State may show termination is in a child's best interest by showing either that the child is adoptable or is in an adoptive placement. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 ¶ 12 (2016).

¶16     Mother argues termination was not in E.C.'s and C.C.'s best interests, citing Mother's age, her bond with E.C., and familial support from her aunt. Despite that, ample evidence supports the court's contrary finding that termination would provide E.C. and C.C. with permanency and stability, which is the court's primary concern when determining a child's best interests in this context. *Alma S.*, 245 Ariz. at 150 ¶¶ 12-13. The court found E.C. was in an adoptive placement while living with his paternal aunt but if his housing changed, he was adoptable. The court found C.C. was in an adoptive placement with the foster family she had been living with since she was released from the hospital after being born and that she was adoptable even if they did not adopt her. The court also found that C.C.'s foster family was willing to facilitate visits between E.C. and C.C. to maintain their familial bond. The court further found there was no biological family member with whom C.C. could be placed.

**¶17** Mother also argues the juvenile court abused its discretion by failing to consider that she had been engaging in rehabilitation efforts since September 2023. While the court may consider a parent's rehabilitation in considering the child's best interests, the court's primary concern is the child's stability and security. *Alma S.*, 245 Ariz. at 148, 150 ¶¶ 1, 12. We defer here to the court's finding that Mother's testimony was unreliable. *Id.* at 151-52 ¶¶ 18-19 (explaining we defer to the juvenile court to determine witness credibility). The court also found Mother would be inconsistent in abstaining from substance use based on her inconsistent engagement with services while severing Mother's parental rights. Mother does not dispute that finding on appeal. The record supports the court's implicit conclusion that Mother's efforts to overcome her substance abuse were not sufficient to make remaining with her in either child's best interests.

**¶18** Finally, Mother contends the court failed to make findings sufficient to support termination. Mother could have moved to amend the juvenile court's termination order on the ground that it lacked sufficient findings of fact, Ariz. R.P. Juv. Ct. 317, but did not. Her failure to do so is a waiver of that argument on appeal. *Logan B.*, 244 Ariz. at 536 ¶¶ 9, 10. Waiver aside, the court's findings were sufficient, as we have explained.

## CONCLUSION

**¶19** For these reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV